Davis, Judge,
delivered the opinion of the court:
This is a claim for disability retired pay by a doctor who *275 served actively in the Army Medical Corps (while in his early thirties) from March 24, 1944, to September 15, 1946. When he entered on active duty he acknowledged that he had previously had asthma and that he suffered moderately from hay fever. Because of these conditions he was put on limited service and at first marked unfit for overseas duty, but some months later he was found suited for limited foreign service with a station, post, or camp complement. Accordingly, he was assigned to an area in the Philippine Islands which was free from asthma and hay fever. There he developed a serious and continuing bout of gastrointestinal trouble which caused his hospitalization in the Philippines from July 25, 1945, to August 12, 1945, and again from September 1, 1945, until October 28, 1945. He was shipped to the mainland at that time, and stayed in Army hospitals, almost continuously, from his arrival until the end of March 1946. During that period he had two separate Disposition Boards (to which we shall later refer). He had no Betiring Board, though the first Disposition Board recommended that he appear before a Betiring Board.[1]
After a 30-day leave and a 2y2 month stint of duty, plaintiff was ordered (in July 1946) to Tilton General Hospital for “evaluation of temporary limited duty prior to separation.” A third Disposition Board met and found him disabled because of his asthma and allergy,[2] but recommended that he be returned to duty in a limited service status. During this process, plaintiff received a telegram from his brother, then in the Philippines, that the latter had suffered an attack of paralytic poliomyelitis and would shortly come to the continental United States for care at the Army-Navy Hospital at Hot Springs, Arkansas. In order to meet his *276 brother on Ms arrival, plaintiff (a surgeon) waived a Retiring Board and asked that the proceedings for his discharge be hastened. He was discharged from the hospital on August 2, 1946, and ordered released from active duty, not for physical disability, at the end of his terminal leave on September 15,1946. An application to the Correction Board (on October 21, 1957) for disability retirement pay was denied, without a hearing, in April 1958. This suit followed on May 4,1960, based upon the gastro-intestinal ailment.
Because plaintiff left active service in the middle of 1946 and brought his action in 1960, defendant says that he is far out of time. We have repeatedly held, however, that a cause of action for disability retirement pay does not accrue on the claimant’s discharge; it does not ripen until he has had a competent board (or unsuccessfully sought one). Friedman v. United States, 159 Ct. Cl. 1, 13-14, 17-18, 24-25, 35, 310 F. 2d 381, 389-90, 391-92, 395-96, 402 (1962), cert. denied, 373 U.S. 932 (1963); Harper v. United States, 159 Ct. Cl. 135, 137-139, 310 F. 2d 405, 406 (1962); Hoppock v. United States, 163 Ct. Cl. 87, 89 (1963); Proper v. United States, 139 Ct. Cl. 511, 154 F. Supp. 317 (1957); Patterson v. United States, 141 Ct. Cl. 435 (1958). The only board proceedings plaintiff ever had or sought were before Disposition Boards and the Correction Board. We have specifically ruled that Disposition Boards are not competent or proper boards to determine retirement for disability. Hoppock v. United States, supra. The Correction Board was, of course, competent, and it was the first competent tribunal to determine plaintiff’s case. Its decision was given only two years before this suit was begun. The claim therefore accrued at that time and not before.
Plaintiff’s waiver of a Retiring Board in the summer of 1946, while he was at Tilton General Hospital, does not alter this conclusion. In this respect, his case is parallel to Harper v. United States, supra, slip op., p. 138, 310 F. 2d at 406-07, in which the court held that a similar declination of a Retiring Board offered to the claimant was “not enough to ripen the claim.” The various factors taken into account in Harper, on this issue, are all present here. Dr. Harper *277 “was greatly concerned over the immediate needs of his family — his wife was in a hospital on account of a mental illness; his children were living with relatives; and his father needed an operation for cancer — and he therefore desired to effect a quick separation” (p. 138 n. 1, 310 F. 2d at 406-07 n. 1). Dr. Grubin, in this case, was concerned over the plight of his brother who was being returned to the United States with paralytic poliomyelitis; as a doctor, plaintiff desired to be present to help and comfort his brother immediately upon his arrival. Harper “was told that Betiring Board proceedings might require additional lengthy hospitalization and that a hardship release would be much speedier” {ibid.). Similarly, this plaintiff knew— from his own personal experience, as well as his knowledge as an Army doctor — that a Betiring Board proceeding would take considerable time and that an ordinary release not for disability would be much quicker. Harper mistakenly “thought that he could ‘get along’ or ‘make [his] own way’ in civilian life” {ibid.). This plaintiff, too, “at the time of his release from active duty * * * felt that he could control his condition in civilian life with proper working hours, diet, and rest.” This proved not to be possible. See finding' 15. The final factor noted in Harper is that neither the claimant nor his doctors fully knew the nature and extent of his disability at the time of his discharge. The same is true in this case. The exact nature of the disfunctioning of plaintiff’s gastrointestinal system is still not entirely clear, but it appears that he probably suffers from ulcerative colitis — an unpleasant and lasting disease of the intestine for which no precise cause is yet known.[3] Plaintiff erred in thinking that his illness, whatever it was, was sufficiently moderate and controllable that he could return to his life as a surgeon; the fact is, as shown in finding 15, that he was soon forced to give up surgery and, then, general practice, and to become a pathologist so that he could minimize *278 stresses and regulate his activities, diet, and rest periods. The Army doctors were likewise mistaken in thinking that plaintiff’s colitis was moderate and improving; the truth, as it now appears, was that the disease was merely quiescent toward the end of his service and flared up at frequent intervals thereafter.
On this issue of the claimant’s declination of a [Retiring Board, Harper is on all fours. We cannot find any significant distinction in the fact that Dr. Harper was a dentist while Dr. Grubin was a surgeon. Like lawyers, medical men are often poor judges of their own cases, and surgeons are not specialists in internal medicine. The events here show that plaintiff was as far wrong as the Army experts. There is no reason to believe that he, any more than Harper, knew (or should be held to have known) the true course of his disability.
On the merits we have to decide whether the Correction Board acted unlawfully, arbitrarily, or without substantial evidentiary support, when it determined that insufficient materials had been presented to indicate probable material error or injustice in plaintiff’s case. The starting point is the Army rule providing that a limited service officer could be found to be permanently incapacitated for active service (and therefore entitled to disability retirement) if he sustained a permanent disability “as the result of a new disease, injury or infirmity of such a degree as could be of itself incapacitating for active (general) service” (finding 24(f)). Plaintiff entered active service with a history of asthma and hay fever, and was put on limited duty for that reason. No claim for retirement is, or could be, grounded on those disabilities. The disputed question is: Did the intestinal sickness of which he thereafter complained bring him within this regulation?
There is no doubt that this infirmity was new, unrelated (except in the most general sense) to the prior defects. There is likewise no doubt that the infirmity evolved and continued to exist during plaintiff’s service. The records of his long hospitalization, detailed in finding 6-13, prove that he developed and suffered intestinal (and connected) *279 troubles which a series of Army doctors characterized as chronic (see findings 7(e), 8(a), 10(a), 12(d)). At the trial in this court, two of plaintiff’s experts (see finding 22) testified that he developed this disease while in the service and continued to have it until and after his release. Neither of defendant’s two medical witnesses (see finding 23) denied these facts, and one affirmatively admitted that at the time of his discharge plaintiff suffered from an “irritable colon syndrome.” On these subsidiary points the Correction Board could not properly find otherwise.
The crucial inquiry is whether the degree of plaintiff’s intestinal disability would be of itself incapacitating for general service. The regulations which were current in 1946 provided, and we have held, that an officer was entitled to disability retirement where he was permanently unfit for general active service of the type he would normally perform, even though he was capable of performing limited duty. See finding 24(f) (g); Weiner v. United States, 148 Ct. Cl. 445, 454-55 (1960); Harper v. United States, 159 Ct. Cl. 135, 141, 310 F. 2d 405, 408 (1962); Dickson v. United States, 159 Ct. Cl. 185, 189-190 (1962). This same concept was incorporated in the regulation dealing specially with a man already on limited service; a new disability would entitle him to retirement if that new “disease, injury or infirmity” would of itself incapacitate him for active general service.
It is clear to us that, in 1946, plaintiff’s intestinal ailments were of the type, and were sufficiently severe and permanent, to require his retirement under the prevailing regulations and policies. Those infirmities were officially recognized by the Army as enough for retirement, if present in adequate degree. A regulation on standards for new commissions indicated that several of plaintiff’s specific gastroenterological problems (including “chronic diseases of the stomach or intestines”) would each be cause for rejection of new applicants. See finding 24(a). That procurement standard would not apply in full force to the different issue of retention on active duty or retirement for physical disability (Towell v. United States, 150 Ct. Cl. 422, 434-36 (1960)), *280 but an Army retirement regulation did require that “due regard” be given to the specific provisions of the procurement regulations, which were not to be “as strictly interpreted as for appointment or entrance on active duty.” See finding 24(g); Boraiko v. United States, 146 Ct. Cl. 814, 819-20 (1959). This means, at the least, that abdominal and rectal infirmities of plaintiff’s type would be the foundation for disability retirement if permanent and sufficiently severe. Plaintiff’s case fits this measure. His onset of gastro-intestinal sickness was such as to unfit him for general duty. His symptoms while in the Army, and the course of his illness during that period, are described in the findings. They indicate that his was far from a trivial complaint. The first Disposition Board, in February 1946, found him incapacitated on the ground of chronic enterocolitis (moderate), with his degree of disability marked as partial but permanent. The second Disposition Board again found chronic enterocolitis, but erroneously mistook a period of relative quiescence for a permanent improvement. The third Disposition Board, likewise wrong in confining itself narrowly to the patient’s current state after a very short stay at Tilton General Hospital, found no symptoms and no disease at that time. In the light of plaintiff’s subsequent history and the expert testimony in this court on the nature of colitis, it is plain that the latter two boards were quite mistaken in thinking that the intestinal ailment was on its way to being cured. There may have been a quiescent period toward the end of plaintiff’s active service, but the disease was still there.
After leaving the service, plaintiff experienced such serious and frequent symptoms that he abandoned surgery for general practice; subsequently, for the same reasons, he gave up general practice and adopted the much quieter and less remunerative life of a pathologist. See finding 15. His private physician reported, in 1951, that he suffered from “chronic ulcerative colitis involving the descending portion of the colon” (but that the disease process was apparently quiescent at that time). In the same year an examination connected with his reserve commission found “mucous *281 colitis, suspicion of ulcer, active colitis * * The oral testimony before this court is to the same general effect. Plaintiff offered the evidence of a specialist in the field of gastroenterology (formerly an Army doctor) who expressed the view that plaintiff, on his discharge, was disabled from performing full military duty by his intestinal disfunction. Plaintiff’s own internist testified that on his return home plaintiff was suffering from ulcerative colitis which has continued.[4] Defendant’s two experts did not really disagree. See finding 23. One testified that ulcerative colitis is characterized by periods of exacerbation and remission and is a disease rarely cured. The other evidently thought that something was wrong with plaintiff’s colon on his discharge but did not affirm or deny that the trouble was ulcerative colitis. There was general agreement among the experts that intestinal difficulties of this sort (including ulcerative colitis) are characterized by periods of remission or quiescence followed by periods of exacerbation.
This record adds up to convincing proof that plaintiff had a permanent case of ulcerative colitis or a similar intestinal disease (as well as attendant difficulties) in a sufficiently serious form that he was permanently disabled, on that account, for general service as a surgeon at the time of his release from active duty in 1946. In deciding otherwise, the Correction Board must either have ignored the governing regulations, or acted upon unsubstantial evidence, or both.[5] On the basis of the evidence before us we are justified in setting its determination aside as unwarranted.
The plaintiff is entitled to recover disability retirement pay from the time of his release from active service (see Friedman v. United States, supra, p. 25, 310 F. 2d at 396; Harper v. United States, supra, p. 141, 310 F. 2d at 408; Schifman v. United States, 162 Ct. Cl. 646, 657, 319 F. 2d 886, 893 (1963), and judgment is entered to that effect. The amount of recovery will be determined under Buie 47 (c) (2).

 Despite this recommendation and a request by his then ward officer (on March 3, 1946) that he be transferred to Tilton General Hospital for appearance before a Retiring Board, plaintiff was ordered transferred to Halloran General Hospital for further observation, treatment, and disposition. Under the controlling regulations, plaintiff should have been ordered before a Retiring Board after the determination of the first Disposition Board since, although that body recommended limited duty, he indicated formally that he did not want to serve in that status. See findings 11, 24(g). Plaintiff remained at Halloran until the latter part of March 1946 when the second Disposition Board recommended that he be returned to limited duty for six months and then have a reconsideration of his physical capacity for military duty.

 This third Disposition Board does not appear to have considered him disabled because of his .gastro-intestinal difficulties.

 One of defendant's experts testified that “the diagnosis of functional colonic disorders and their differentiation from other conditions is probably the most complex problem in gastroenterology,” and that the actual cause of plaintiff’s complaint was never really found.

 A radiologist supported the possibility that rest and sedation in Army hospitals prior to plaintiff’s discharge may have occasioned the lack of spas-ticity in his colon during that period.

 The Board did not spell out its reasons for denying plaintiff’s application for a hearing.